******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DAVID G. LIEBENGUTH
## (SC 20145)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The defendant was convicted of breach of the peace in the second degree in connection with an incident in which he confronted and directed certain comments and racial slurs at M, an African-American parking enforcement officer, who, immediately beforehand, had placed a parking ticket on the defendant's vehicle for being parked in a metered space without payment. Upon returning to his vehicle and finding the parking ticket, the defendant confronted M. After M and the defendant exchanged words, the situation escalated, and the defendant told M that the parking authority with which he was employed was "fucking unbelievable" and that he issued the parking ticket because the defendant's car was "white." The defendant then told M that the actual reason he was given a parking ticket was because he was white. As the defendant started to walk away from M, the defendant stated, "remember Ferguson," which apparently was a reference to a then recent and highly publicized shooting of an African-American man by a white police officer in Ferguson, Missouri. Thereafter, both M and the defendant returned to and entered their vehicles, both of which had at least some of their windows down. M then thought he heard the defendant say the words "fucking niggers," which caused him to believe that the defendant's earlier comment about Ferguson was a threat meant to imply that what had happened in Ferguson was going to happen to him. As M was driving away, the defendant cut through the parking lot in his vehicle, approached M's vehicle, and then drove past M. As the defendant was driving past M, he looked directly at M with an angry expression and repeated the slur "fucking niggers" louder than he had the first time he uttered it. On appeal to the Appellate Court from the judgment of conviction, the defendant claimed, inter alia, that the evidence was insufficient to sustain his breach of the peace conviction insofar as the racial taunts that he directed at M were protected by the first amendment to the United States constitution and, therefore, could not form the basis of such a conviction. The Appellate Court reversed the defendant's conviction, concluding, inter alia, that the defendant's utterances were unlikely to provoke an immediate, violent response by a reasonable person in M's shoes and, thus, were not prohibited fighting words under the first amendment. On the granting of certification, the state appealed to this court. *Held* that, contrary to the determination of the Appellate Court, the language the defendant used to demean, intimidate and anger M, when considered in the circumstances in which that language was used, constituted fighting words likely to provoke an immediate, violent response from a reasonable person in M's position, and, accordingly, the first amendment did not prohibit the state's use of the defendant's words to obtain his breach of the peace conviction: the defendant's use of the word "niggers," which is inextricably linked to racial prejudice and oppression, and which, when used by a white person as an assertion of the racial inferiority of an African-American person, is highly offensive and demeaning, his use of the profane adjective "fucking" to modify the word "niggers" to emphasize his anger, his continued escalation of the confrontation by approaching M while they were in their vehicles, looking at M with an angry expression as he drove by and repeating the words "fucking niggers," and his use of aggressive hand and bodily gestures and other profanities and racially charged innuendos earlier on in the confrontation all served to incite an immediate, violent response by a reasonable person in M's shoes; moreover, although M, like any parking enforcement officer, undoubtedly was aware that some members of the public might express frustration or anger upon receiving a ticket, and although M did not react violently despite the highly inflammatory and inciting nature of the defendant's words and conduct, this court disagreed that the average African-American parking official would

have been prepared for and responded peaceably to the kind of racial slurs and threatening behavior with which M was confronted; furthermore, the fact that the defendant and M were in their vehicles when the defendant used the epithet "fucking niggers" was of no consequence, as the two men were in close proximity to and maintained eye contact with each other, so that each could see and hear each other clearly, and M was in a position to pursue the defendant or to retaliate immediately.

(*Two justices concurring separately in two opinions*)

Argued March 29, 2019—officially released August 27, 2020**

*Procedural History*

Amended information charging the defendant with breach of the peace in the second degree and tampering with a witness, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number twenty, and tried to the court, *Hernandez, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *DiPentima, C. J.*, and *Sheldon* and *Devlin, Js.*, which reversed in part the trial court's judgment and remanded the case to that court with direction to render a judgment of acquittal on the charge of breach of the peace in the second degree, and the state, on the granting of certification, appealed to this court. *Reversed in part*; *judgment directed.*

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Nadia C. Prinz*, former deputy assistant state's attorney, for the appellant (state).

*John R. Williams*, for the appellee (defendant).

*Opinion*

PALMER, J. Under General Statutes § 53a-181 (a) (5), a person is guilty of breach of the peace in the second degree when, with the intent to cause inconvenience, annoyance or alarm, he uses abusive language in a public place.[1] That broad statutory proscription, however, is limited by the free speech provisions of the first amendment to the United States constitution,[2] which prohibit the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content"; (internal quotation marks omitted) *Ashcroft* v. *American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002); thereby protecting speech "without regard . . . to the truth, popularity, or social utility of the ideas and beliefs [that] are offered." *National Assn. for the Advancement of Colored People* v. *Button*, 371 U.S. 415, 445, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963). These safeguards, however, although expansive, are not absolute, and the United States Supreme Court has long recognized a few discrete categories of speech that may be prosecuted and punished, including so-called "fighting words"—"those personally abusive epithets [that], when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen* v. *California*, 403 U.S. 15, 20, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971). In this certified appeal, we must determine whether certain vulgar and racially charged remarks of the defendant, David G. Liebenguth, which included multiple utterances of the words "fucking niggers" directed at an African-American parking enforcement official during a hostile confrontation with that official following the defendant's receipt of a parking ticket, were "fighting words" subject to criminal sanctions. As a result of his conduct, the defendant was arrested and charged with breach of the peace in the second degree in violation of § 53a-181 (a) (5) and, following a trial to the court, was found guilty.[3] On appeal to the Appellate Court, the defendant claimed, inter alia, that the evidence was insufficient to support the trial court's finding of guilty because the words he uttered to the parking official constituted protected speech that could not, consistent with the first amendment, provide the basis of a criminal conviction. See *State* v. *Liebenguth*, 181 Conn. App. 37, 47, 186 A.3d 39 (2018). Although acknowledging that the defendant's language was "extremely vulgar and offensive" and "meant to personally demean" the official; id., 53; the Appellate Court, with one judge dissenting, agreed with the defendant that his speech was constitutionally protected and that, consequently, his conviction, because it was predicated on that speech, could not stand. See id., 54; see also id., 58 (*Devlin, J.*, concurring in part and dissenting in part). We granted the state's petition for certification to appeal, limited to the question of whether the Appellate Court correctly concluded that

the defendant's conviction must be reversed because the first amendment barred his prosecution for the verbal statements at issue. See *State* v. *Liebenguth*, 330 Conn. 901, 189 A.3d 1231 (2018). We now conclude that the defendant's remarks were unprotected fighting words and, therefore, that his conviction does not run afoul of the first amendment. Accordingly, we reverse the judgment of the Appellate Court in part and remand the case to that court with direction to affirm the trial court's judgment with respect to his conviction of breach of the peace in the second degree.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "Michael McCargo, a parking enforcement officer for the town of New Canaan, testified that he was patrolling the [Morse] Court parking lot on the morning of August 28, 2014, when he noticed that the defendant's vehicle was parked in a metered space for which no payment had been made. He first issued a [fifteen dollar parking] ticket for the defendant's vehicle, then walked to another vehicle to issue a ticket, while his vehicle remained idling behind the defendant's vehicle. As McCargo was returning to his vehicle, he was approached by the defendant, whom he had never before seen or interacted with. The defendant said to McCargo, 'not only did you give me a ticket, but you blocked me in.' Initially believing that the defendant was calm, McCargo jokingly responded that he didn't want the defendant getting away. When the defendant then attempted to explain why he had parked in the lot, McCargo responded that his vehicle was in a metered space for which payment was required, not in one of the lot's free parking spaces. McCargo testified that the defendant's demeanor then 'escalated,' with the defendant [having said] that the parking authority was '[fucking] [un]believable' and [having told] McCargo that he had given him a parking ticket 'because my car is white. . . . [N]o, [you gave] me a ticket because I'm white.' As the defendant, who is white, spoke with McCargo, who is African-American, he 'flared' his hands and added special emphasis to the profanity he uttered. Even so, according to McCargo, the defendant always remained a 'respectable' distance from him. Finally, as the defendant was walking away from McCargo toward his own vehicle, he spoke the words, 'remember Ferguson.'" *State* v. *Liebenguth*, supra, 181 Conn. App. 39–40.

McCargo also testified that, "[a]fter both men had returned to and reentered their vehicles, McCargo, whose window was rolled down . . . thought he heard the defendant say the words, 'fucking niggers.' This caused him to believe that the defendant's prior comment about Ferguson had been made in reference to the then recent [and highly publicized] shooting of an African-American man by a white police officer in Ferguson, Missouri [on August 9, 2014, approximately three

weeks earlier]. [McCargo] thus believed that the [defendant's reference to Ferguson was a 'threat'] meant to imply that what had happened in Ferguson 'was going to happen' to him. McCargo also believed that, by uttering the racial slur and making reference to Ferguson, the defendant was trying to rile him up and [to] escalate the situation [by 'taking it to a whole other level']. That, however, did not happen, for, although McCargo found the remark offensive, and he had never before been the target of such language while performing his duties, he remained calm at all times and simply drove away to resume his patrol." Id., 40. McCargo further testified, however, that, "[s]hortly thereafter . . . as [McCargo] was driving away, the defendant [cut through the parking lot in his vehicle, approached McCargo, and then] drove past him." Id., 40–41. As the defendant was driving past McCargo, "the defendant turned toward him, looked directly at him with an angry expression on his face, and repeated the slur, 'fucking niggers.' McCargo [also] noted in his testimony that the defendant said the slur louder the second time than he had the first time.

"After the defendant drove out of the parking lot, McCargo [who was shocked and personally offended by the encounter] called his supervisor, who instructed him to report the incident to the New Canaan police. In his report, McCargo noted that there might have been a witness to the interaction, whom he described as a young, white female. The defendant later was arrested in connection with the incident on the charge of breach of the peace in the second degree." Id., 41.

"Next to testify was Mallory Frangione, the young, white female witness to the incident whom McCargo had mentioned in his report. She testified that she parked in the [Morse] Court parking lot around 9:45 a.m. on . . . August 28, 2014, and, as soon as she opened her car door, she heard yelling. She then saw two men, McCargo and the defendant, who were standing outside of their vehicles about seventy feet away from her. She observed that the defendant was moving his hands all around, that his body movements were aggressive and irate, and that his voice was loud. She heard him say something about Ferguson, then say that something was '[fucking] unbelievable.' [Frangione] further testified that she saw the defendant take steps toward McCargo while acting in an aggressive manner. She described McCargo, by contrast, as calm, noting that he never raised his voice, moved his arms or gesticulated in any way. McCargo ultimately backed away from the defendant and got into his vehicle. The defendant, [Frangione] recalled, drove in two circles around the parking lot before leaving. Frangione testified that witnessing the interaction made her feel nervous and upset."[4] Id.

"After the state rested [its case], the defendant moved

for a judgment of acquittal . . . which the court denied. The defendant elected not to testify. The court, ruling from the bench, found the defendant guilty . . . . It reasoned as follows: 'In finding that the defendant's language and behavior [are] not protected speech, the court considers the words themselves, in other words, the content of the speech, the context in which [they were] uttered, and all of the circumstances surrounding the defendant's speech and behavior.

" 'The court finds that the defendant's language, fucking niggers directed at . . . McCargo twice . . . is not protected speech. . . . [I]n the American lexicon, there is no other racial epithet more loaded with racial animus, no other epithet more degrading, demeaning or dehumanizing. It is a word [that] is probably the most [vile] racial epithet a non-African-American can direct [toward] an African-American. [The defendant] is white. . . . McCargo is African-American.

" 'In light of this country's long and shameful history of state sanctioned slavery, Jim Crow segregation, state sanctioned racial terrorism, financial and housing discrimination, the word simply has . . . no understanding under these circumstances other than as a word directed to incite violence. The word itself is a word likely to provoke a violent response.

" 'The defendant is not however being prosecuted solely for use of this word. All language must be considered in light of its context.

" 'The court finds that considering . . . the content of the defendant's speech taken in context and in light of his belligerent tone, his aggressive stance, the fact that he was walking [toward] . . . McCargo and moving his hands in an aggressive manner, there's no other interpretation other than these are fighting words.[5] And he uttered the phrase not once but twice. It was directed—the court finds that it was directed directly at . . . McCargo. There were no other African-Americans present . . . in the parking lot when it happened, and indeed . . . McCargo's unease and apprehension at hearing those words [were] corroborated by . . . Frangione who . . . said that she felt disconcerted by the defendant's tone of voice and his aggressive stance and actions.' " (Footnote added.) Id., 43–44.

The defendant thereafter appealed to the Appellate Court, claiming, inter alia, that the evidence was insufficient to support his conviction of breach of the peace in the second degree. Id., 39. Specifically, he maintained that the racial taunts he directed at McCargo were protected by the first amendment and, therefore, could not form the basis of a conviction under § 53a-181 (a) (5). Id., 47. Relying in large measure on this court's decision in *State* v. *Baccala*, 326 Conn. 232, 163 A.3d 1, cert. denied, U.S. , 138 S. Ct. 510, 199 L. Ed. 2d 408 (2017),[6] the Appellate Court, in a two-to-one decision,

agreed with the defendant that the evidence was insufficient to support his conviction because his utterances were unlikely to provoke an immediate, violent response by a reasonable person in McCargo's shoes— that is, his utterances were not prohibited fighting words, and, therefore, the defendant's conviction could not pass muster under the first amendment. See *State* v. *Liebenguth*, supra, 181 Conn. App. 53–54.

In support of its conclusion, the Appellate Court reasoned: "[T]he defendant used extremely vulgar and offensive language, meant to personally demean McCargo. Under the circumstances in which he uttered this language, however, it was not likely to tend to provoke a reasonable person in McCargo's position immediately to retaliate with violence. Although the evidence unequivocally supports a finding that the defendant at one point walked toward McCargo while yelling and moving his hands . . . [t]he evidence [also] unequivocally shows . . . that the defendant was in his car both times that he directed the racial slurs toward McCargo. McCargo did testify that the defendant's use of the slurs shocked and appalled him, and that he found the remarks offensive. He also testified, however, that he remained calm throughout the encounter and felt no need to raise his voice to the defendant. A reasonable person acting in the capacity of a parking official would be aware that some level of frustration might be expressed by some members of the public who are unhappy with receiving tickets and would therefore not be likely to retaliate with immediate violence during such an interaction. In reviewing the entire context of the interaction, we therefore find that, because McCargo was unlikely to retaliate with immediate violence to the conduct for which the defendant was charged, the defendant's words were not 'fighting words,' [on] which he might appropriately be convicted of breach of the peace. The defendant's conviction of breach of the peace in the second degree must therefore be reversed." (Footnotes omitted.) Id.

Judge Devlin dissented with respect to this holding because, in his view, the defendant's remarks, when considered in the context in which they were uttered, constituted fighting words that were likely to provoke a reasonable person in McCargo's position to retaliate with violence. See id., 66 (*Devlin, J.*, concurring in part and dissenting in part). Judge Devlin concluded that the majority did not adequately account for the truly heinous and inflammatory nature of the word "nigger," in particular, when, as in the present case, that "viciously hostile epithet," which has deep roots in this nation's long and deplorable history of racial bigotry and discrimination, is used by a white person with the intent of demeaning and humiliating an African-American person. (Internal quotation marks omitted.) Id., 64–65 (*Devlin, J.*, concurring in part and dissenting in part). In rejecting the defendant's assertion that his

speech was shielded from prosecution by the first amendment, Judge Devlin explained that the defendant's words "were scathing insults that in many situations would provoke a reflexive, visceral response." Id., 67 (*Devlin, J.*, concurring in part and dissenting in part). Indeed, according to Judge Devlin, "if angrily calling an African-American man a 'fucking [nigger]' after taunting him with references to a recent police shooting of a young African-American man by a white police officer is not breach of the peace," then the fighting words doctrine no longer has any "continued vitality" under the first amendment. (Internal quotation marks omitted.) Id., 68 (*Devlin, J.*, concurring in part and dissenting in part).

We subsequently granted the state's petition for certification to appeal to decide whether the Appellate Court was correct in holding that the defendant's conviction had to be reversed because the language that formed the basis of that conviction was protected by the first amendment.[7] For the reasons that follow, we agree with Judge Devlin and the trial court that, under the circumstances presented, the first amendment does not bar the defendant's conviction because his racist and demeaning utterances were likely to incite a violent reaction from a reasonable person in McCargo's position.[8]

For purposes of this appeal, there is no dispute that the evidence adduced by the state at trial supports the trial court's factual findings. The sole issue we must decide, then, is whether, contrary to the determination of the Appellate Court, those factual findings and any inferences that reasonably may be drawn therefrom are sufficient to establish the defendant's guilt beyond a reasonable doubt. See, e.g., *State* v. *Parnoff*, 329 Conn. 386, 395, 186 A.3d 640 (2018).

Because the defendant's conviction is predicated on his verbal statements, our determination of the sufficiency of the state's case necessarily depends on whether those statements deserve the protection of the first amendment, despite their patently offensive and objectionable nature. If they do, they cannot serve as the basis for his conviction, which would have to be reversed for evidentiary insufficiency. The defendant having been charged with violating § 53a-181 (a) (5) by use of allegedly "abusive . . . language"; General Statutes § 53a-181 (a) (5); see footnote 1 of this opinion; we therefore must decide whether his language, which was no doubt "abusive" under the commonly understood meaning of that term, nonetheless is entitled to constitutional protection. To make that determination, we apply the judicial gloss necessary to limit the reach of the breach of the peace statute to ensure that it comports with constitutional requirements. See *State* v. *Baccala*, supra, 326 Conn. 234, 251 (placing gloss on § 53a-181 (a) (5) to avoid possibility of conviction

founded on constitutionally protected speech). For present purposes, "the constitutional guarantee of freedom of speech requires that [§ 53a-181 (a) (5)] be confined to language [that], under the circumstances of its utterance, constitutes [unprotected] fighting words—those [that] by their very utterance inflict injury or tend to incite an immediate breach of the peace." (Internal quotation marks omitted.) *State* v. *Beckenbach*, 1 Conn. App. 669, 678, 476 A.2d 591 (1984), rev'd on other grounds, 198 Conn. 43, 501 A.2d 752 (1985). "Accordingly, to establish the defendant's violation of § 53a-181 (a) (5) . . . in light of its constitutional gloss, the state was required to prove beyond a reasonable doubt that the defendant's words were likely to provoke an imminent violent response" under the circumstances in which they were uttered. (Citation omitted.) *State* v. *Baccala*, supra, 250–51.

In view of the fact that the state's case against the defendant implicates his free speech rights, several additional principles govern our review of the issue presented. In certain cases, such as the present one, in which "[the line between speech unconditionally guaranteed and speech that may be legitimately regulated] must be drawn, the rule is that we examine for ourselves the statements [at] issue and the circumstances under which they were made to see if they are consistent with the first amendment." (Internal quotation marks omitted.) Id., 251. In other words, "the inquiry into the protected status of . . . speech is one of law, not fact." (Internal quotation marks omitted.) *State* v. *Parnoff*, supra, 329 Conn. 395. We therefore "apply a de novo standard of review . . . ." (Internal quotation marks omitted.) Id. Accordingly, we have "an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression." (Internal quotation marks omitted.) Id., 395–96. "This independent scrutiny, however, does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue constituted [fighting words], we accept all subsidiary credibility determinations and findings that are not clearly erroneous." (Internal quotation marks omitted.) Id., 396.

Recently, in *State* v. *Baccala*, supra, 326 Conn. 237–50, we undertook a thoroughgoing examination of the roots and scope of the fighting words doctrine, which was first articulated by the United States Supreme Court more than seventy-five years ago in *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). See id., 569, 573 (holding that "God damned racketeer" and "damned Fascist" were epithets likely to provoke addressee to retaliate violently, thereby causing breach of the peace (internal quotation marks omitted)). As we explained in *Baccala*; see *State* v.

*Baccala*, supra, 237–38; although the first amendment protects nearly all speech, no matter how detestable or odious it may be, that protection does not extend to the extremely narrow category of words that "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." (Internal quotation marks omitted.) *Chaplinsky* v. *New Hampshire*, supra, 573. In recognizing the fighting words exception to the protection ordinarily afforded speech under the first amendment, the court in *Chaplinsky* reasoned that such words comprise "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest" in maintaining the peace by preventing the immediate incitement of violence. Id., 572.

It is by now well settled that there are no per se fighting words because words that are likely to provoke an immediate, violent response when uttered under one set of circumstances may not be likely to trigger such a response when spoken in the context of a different factual scenario. See *State* v. *Baccala*, supra, 326 Conn. 238. Consequently, whether words are fighting words necessarily will depend on the particular circumstances of their utterance. See id., 239; see also *State* v. *Hoskins*, 35 Conn. Supp. 587, 591, 401 A.2d 619 (App. Sess. 1978) ("The fighting words concept has two aspects. One involves the quality of the words themselves. The other concerns the circumstances under which the words are used." (Internal quotation marks omitted.)). This contextual approach is also "a logical reflection of the way the meaning and impact of words change over time." *State* v. *Baccala*, supra, 239; see also id. ("[w]hile calling someone a racketeer or a fascist might naturally have invoked a violent response in the 1940s when *Chaplinsky* was decided, those same words would be unlikely to even raise an eyebrow today"). Indeed, due to changing social norms, public discourse has become coarser in the years following *Chaplinsky*; id., 298 (*Eveleigh, J.*, concurring in part and dissenting in part); such that, today, "there are fewer combinations of words and circumstances that are likely to fit within the fighting words exception."[9] *State* v. *Parnoff*, supra, 329 Conn. 413 (*Kahn, J.*, concurring in the judgment); see also id. ("[a]s certain language is acceptable in more situations, the borders of the fighting words exception contract").

Against this broad jurisprudential backdrop in *Baccala*, we sought to identify the kinds of considerations likely to be relevant in determining, in any given case, whether the words at issue constituted unprotected fighting words. We explained: "A proper contextual analysis requires consideration of the actual circumstances as perceived by a reasonable speaker and addressee to determine whether there was a likelihood of violent retaliation. . . . This necessarily includes a

consideration of a host of factors.

"For example, the manner and circumstances in which the words were spoken . . . [and] [t]he situation under which the words are uttered . . . . Thus, whether the words were preceded by a hostile exchange or accompanied by aggressive behavior will bear on the likelihood of such a reaction. . . .

"A proper examination of context also considers those personal attributes of the speaker and the addressee that are reasonably apparent because they are necessarily a part of the objective situation in which the speech was made. . . . Courts have, for example, considered the age, gender, race, and status of the speaker. . . . Indeed, common sense would seem to suggest that social conventions, as well as special legal protections, could temper the likelihood of a violent response when the words are uttered by someone less capable of protecting [himself or herself], such as a child, a frail elderly person, or a seriously disabled person.

"Although . . . the speech must be of such a nature that it is likely to provoke the *average* person to retaliation . . . when there are objectively apparent characteristics that would bear on the likelihood of such a response, many courts have considered the average person with those characteristics. Thus, courts also have taken into account the addressee's age, gender, and race. . . .

"Similarly, because the fighting words exception is concerned with the likelihood of violent retaliation, it properly distinguishes between the average citizen and those addressees who are in a position that carries with it an expectation of exercising a greater degree of restraint. . . . [Consequently, because] a properly trained [police] officer may reasonably be expected to exercise a higher degree of restraint than the average citizen . . . [we] hold police officers to a higher standard than ordinary citizens when determining the likelihood of a violent response by the addressee." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) *State* v. *Baccala*, supra, 326 Conn. 240–44.

In addition, "several courts have considered as part of the contextual inquiry whether the addressee's position would reasonably be expected to cause him or her to exercise a higher degree of restraint than the ordinary citizen under the circumstances." Id., 245. "Finally . . . the fighting words exception is not concerned with creating symmetrical free speech rights by way of establishing a uniform set of words that are constitutionally proscribed. . . . Rather, because the fighting words exception is intended only to prevent the likelihood of an actual violent response, it is an unfortunate but necessary consequence that we are required to differen-

tiate between addressees who are more or less likely to respond violently and speakers who are more or less likely to elicit such a response." (Citation omitted.) Id., 249.

We then summarized: "Accordingly, a proper contextual analysis requires consideration of the actual circumstances, as perceived by both a reasonable speaker and addressee, to determine whether there is a likelihood of violent retaliation. This necessarily includes the manner in which the words were uttered, by whom and to whom the words were uttered, and any other attendant circumstances that were objectively apparent and bear on the question of whether a violent response was likely." Id., 250. The starting point, however, for any analysis of a claim involving the fighting words doctrine must include an examination of the words themselves and the extent to which they are understood to be inflammatory or inciting.

With respect to the language at issue in the present case, the defendant, who is white, uttered the words "fucking niggers" to McCargo, an African-American person, thereby asserting his own perceived racial dominance and superiority over McCargo with the obvious intent of denigrating and stigmatizing him. When used in that way, "[i]t is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination." *McGinest* v. *GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004). Not only is the word "nigger" undoubtedly the most hateful and inflammatory racial slur in the contemporary American lexicon; see id.; but it is probably the single most offensive word in the English language. See, e.g., *Ayissi-Etoh* v. *Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("'[The] epithet ['nigger'] has been labeled, variously, a term that 'sums up . . . all the bitter years of insult and struggle in America,' [L. Hughes, The Big Sea: An Autobiography (Hill and Wang 2d Ed. 1993) p. 269], 'pure anathema to African-Americans,' *Spriggs* v. *Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001), and 'probably the most offensive word in English.' [Random House Webster's College Dictionary (2d Rev. Ed. 2000) p. 894]. See generally [A. Haley, Roots: The Saga of an American Family (Doubleday 1976); [H. Lee, To Kill a Mockingbird (J. B. Lippincott Co. 1960)]. . . . No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans." (Citation omitted.)); R. Kennedy, "The David C. Baum Lecture: 'Nigger!' as a Problem in the Law," 2001 U. Ill. L. Rev. 935, 935 (although "[t]he American language is (and has long been) rife with terms of ethnic, racial, and national insult: kike, mick, wop, nip, gook, honkie, wetback, chink, [etc.] . . . 'nigger is now probably the most offensive word in English'" (footnote omitted)); Dictionary.com, available at https://

www.dictionary.com/browse/nigger?s=t ("The term nigger is now probably the most offensive word in English. Its degree of offensiveness has increased markedly in recent years, although it has been used in a derogatory manner since at least the Revolutionary War.").

In fact, because of the racial prejudice and oppression with which it is forever inextricably linked, the word "nigger," when used by a white person as an assertion of the racial inferiority of an African-American person, "is more than [a] mere offensive utterance . . . . No word . . . is as odious or loaded with as terrible a history." (Internal quotation marks omitted.) *Daso* v. *Grafton School, Inc.*, 181 F. Supp. 2d 485, 493 (D. Md. 2002); see also *In re John M.*, 201 Ariz. 424, 428, 36 P.3d 772 (App. 2001) ("the term is generally regarded as virtually taboo because of the legacy of racial hatred that underlies the history of its use among whites" (internal quotation marks omitted)); *In re Spivey*, 345 N.C. 404, 414, 480 S.E.2d 693 (1997) ("[N]o fact is more generally known than that a white man who calls a black man a 'nigger' within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate. The trial court was free to judicially note this fact."). The word being "one of insult, abuse and belittlement harking back to slavery days"; (internal quotation marks omitted) *Taylor* v. *Metzger*, 152 N.J. 490, 510, 706 A.2d 685 (1998); it is uniquely "expressive of racial hatred and bigotry"; (internal quotation marks omitted) *Swinton* v. *Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001), cert. denied, 535 U.S. 1018, 122 S. Ct. 1609, 152 L. Ed. 2d 623 (2002); and "degrading and humiliating in the extreme . . . ." (Citation omitted; internal quotation marks omitted.) *Pryor* v. *United Air Lines, Inc.*, 791 F.3d 488, 496 (4th Cir. 2015). For all these reasons, the word rightly has been characterized as "the most provocative, emotionally-charged and explosive term in the [English] language." (Internal quotation marks omitted.) *Lee* v. *Superior Court*, 9 Cal. App. 4th 510, 513, 11 Cal. Rptr. 2d 763 (1992).

In addition to the defendant's use of the word "niggers," other language and conduct by the defendant further inflamed the situation, rendering it that much more likely to provoke a violent reaction. First, the defendant used the profane adjective "fucking"—a word of emphasis meaning wretched, rotten or accursed[10]—to intensify the already highly offensive and demeaning character of the word "niggers." Like the term "nigger," however, the term " 'fucking nigger' [is] . . . so powerfully offensive that . . . [it] inflicts cruel injury by its very utterance. It is degrading, it is humiliating, and it is freighted with a long and shameful history of humiliation, the ugly effects of which continue to haunt us all." *Augis Corp.* v. *Massachusetts Commission Against Discrimination*, 75 Mass. App. 398, 409, 914 N.E.2d 916, appeal denied, 455 Mass. 1105, 918 N.E.2d 90 (2009). The defendant's resort to such

language underscored for McCargo how especially incensed and insulted the defendant was by virtue of his having been issued the ticket by an African-American parking official. By adding this additional measure of contempt and disgust to the epithet, the defendant only amplified the assaultive nature of the utterance, making it even more hateful and debasing.

Second, the defendant, having directed the term "fucking niggers" at McCargo upon entering his vehicle and learning that McCargo had ticketed him, was not content just to leave and end the confrontation. Instead, after McCargo had entered his vehicle and was starting to drive out of the parking lot, the defendant circled the lot twice, pulled up next to McCargo and, while looking angrily at him, again uttered the term "fucking niggers," this time more loudly than before. The fact that the defendant repeated this epithet only served to exacerbate the provocative and hostile nature of the confrontation. See *Landrum* v. *Sarratt*, 352 S.C. 139, 145, 572 S.E.2d 476 (App. 2002) (whether epithets were uttered repeatedly is factor to be considered in fighting words determination); see also *State* v. *Szymkiewicz*, 237 Conn. 613, 615–16, 623, 678 A.2d 473 (1996) (holding that certain epithets were fighting words due, in part, to repeated nature of utterances).

Third, the defendant employed additional, racially offensive, crude and foreboding language during his interaction with McCargo. Early on in the defendant's confrontation with McCargo, after learning that he had been issued a ticket, the defendant became angry and loudly asserted that the parking authority, McCargo's employer, was "fucking unbelievable." Almost immediately thereafter, the defendant injected race into the encounter, first stating that McCargo had ticketed him because his car is white and then accusing McCargo of issuing him the ticket because the defendant himself is white. Next, as the defendant walked to his vehicle, he uttered the words, "remember Ferguson." In light of the defendant's other racially charged remarks, his menacing invocation of the extremely controversial shooting of a young, unarmed African-American man by a white police officer had its intended effect: McCargo understood that the defendant was raising the specter of the same race based violence that reportedly had occurred in Ferguson, Missouri. Considering the defendant's offensive remarks together, as we must; see, e.g., *State* v. *Parnoff*, supra, 329 Conn. 401 n.5 (fighting words determination requires consideration of "the totality of the attendant circumstances"); the defendant's reference to Ferguson significantly escalated the already fraught and incendiary confrontation.

Finally, in addition to his offensive and intimidating utterances, certain conduct by the defendant further manifested his extreme anger and hostility toward McCargo. As the two men were speaking outside of

their respective vehicles, the defendant stepped toward McCargo while moving his hands and body in an aggressive and irate manner. Frangione witnessed the defendant's conduct and testified that, even from about seventy feet away, the hostility of the encounter made her nervous and upset. Moreover, after entering his car, the defendant drove through the parking lot twice before leaving, cutting through empty parking spaces so he could pass by McCargo and again angrily confront him. As we observed in *Baccala*, the fact that the defendant's words were accompanied by such aggressive and menacing behavior increased the likelihood of a violent response. See *State* v. *Baccala*, supra, 326 Conn. 241.

As we previously discussed, speech will be deemed to be unprotected fighting words only if it so "touch[es] the raw nerves of [the addressee's] sense of dignity, decency, and personality . . . [that it is likely] to trigger an immediate violent reaction"; (internal quotation marks omitted) *State* v. *Beckenbach*, supra, 1 Conn. App. 678; a standard that, we have said, is satisfied only if the speech is so inflammatory that it "is akin to dropping a match into a pool of gasoline." (Internal quotation marks omitted.) *State* v. *Parnoff*, supra, 329 Conn. 394. We believe this to be the rare case in which that demanding standard has been met. Born of violence, the word "nigger," when uttered with the intent to personally offend and demean, also engenders violence. Indeed, such use of the word "nigger" aptly has been called "a classic case" of speech likely to incite a violent response. *In re Spivey*, supra, 345 N.C. 415; see also *State* v. *Hoshijo ex rel. White*, 102 Haw. 307, 322, 76 P.3d 550 (2003) ("The experience of being called 'nigger' . . . is like receiving a slap in the face. The injury is instantaneous." (Internal quotation marks omitted.)). It therefore is unsurprising that many courts have rejected first amendment challenges to convictions predicated on the use of the word. See, e.g., *In re John M.*, supra, 201 Ariz. 428 ("lean[ing] out of a car window and scream[ing] at an African-American woman, 'fuck you, you god damn nigger,' before the car pulled into a nearby . . . parking lot" was behavior likely to provoke an immediate violent response); *State* v. *Hoshijo ex rel. White*, supra, 321 (speech of student manager of university basketball team who yelled "shut up you [fucking] nigger," "I'm tired of hearing your shit," and [s]hut your mouth or I'll kick your ass" to African-American spectator constituted unprotected fighting words); *In re J.K.P.*, Docket No. 108,617, 2013 WL 1010694, *1, *3–5 (Kan. App. March 8, 2013) (calling boys in group of African-American children "niggers" during altercation with them constituted fighting words that violated disorderly conduct statute) (decision without published opinion, 296 P.3d 1140 (2013)); *In re Shane EE.*, 48 App. Div. 3d 946, 946–47, 851 N.Y.S.2d 711 (2008) (threats and racial slurs, including " 'we shoot niggers like you in the woods,' " were likely to provoke

immediate violent reaction and therefore constituted fighting words); *In re Spivey*, supra, 408, 414 ("loudly and repeatedly address[ing] a black patron [at a bar] . . . using the derogatory and abusive racial epithet 'nigger'" was conduct that "squarely falls within the category of unprotected [fighting words]"); *In re H.K.*, 778 N.W.2d 764, 766–67, 770 (N.D. 2010) (following African-American girl into bathroom during dance, calling her "nigger" and threatening her constituted fighting words likely to incite breach of peace); see also *Bailey* v. *State*, 334 Ark. 43, 53–54, 972 S.W.2d 239 (1998) (stating that word "nigger" was fighting word in context used); *Lee* v. *Superior Court*, supra, 9 Cal. App. 4th 518 (upholding trial court's denial of request by African-American to change his name from Russell Lawrence Lee to "Misteri Nigger" and stating that "men and women . . . of common intelligence would understand [that] . . . [the word nigger] likely [would] cause an average addressee to fight" (internal quotation marks omitted)). To whatever extent public discourse in general may have coarsened over time; see, e.g., *State* v. *Baccala*, supra, 326 Conn. 239; it has not eroded to the point that the racial epithets used in the present case are any less likely to provoke a violent reaction today than they were in previous decades.

In support of his contention that the Appellate Court correctly concluded that his language did not constitute fighting words, the defendant argues that "a public official [such as McCargo] is expected to exercise a greater degree of self-restraint in the face of provocation than is a civilian." To support this assertion, however, the defendant cites to cases involving offensive language directed at police officers,[11] in particular, *Resek* v. *Huntington Beach*, 41 Fed. Appx. 57 (9th Cir. 2002), in which the court, in concluding that the words " '[t]hat's fucked up, those pigs can't do that' " were not fighting words; id., 59; went on to explain that, "[a]long with good judgment, intelligence, alertness, and courage, the job of police officers requires a thick skin. Theirs is not a job for people whose feelings are easily hurt." Id. Although we agree that police officers generally are expected to exercise greater restraint than the average citizen when confronted with offensive language or unruly conduct, McCargo was not a police officer, and his duties cannot fairly be characterized as similar to those of a police officer. Additionally, McCargo's testimony concerning his five years of experience as a parking enforcement officer—testimony in which he explained that he never before had been on the receiving end of such hostile or offensive language or had ever reported a prior incident to the police—suggests that the abuse McCargo endured during his encounter with the defendant well exceeded that which someone in his position reasonably might be expected to face. Consequently, although we do agree with the Appellate Court that McCargo, like any parking enforcement offi-

cial, undoubtedly was aware that some members of the public might well express frustration and even anger upon receiving a ticket;[12] see, e.g., *State* v. *Liebenguth*, supra, 181 Conn. App. 54; we disagree that the average African-American parking official would have been prepared for and responded peaceably to the kind of racial slurs, threatening innuendo, and aggressive behavior with which McCargo was confronted.

It is true, of course, that McCargo did not react violently despite the highly inflammatory and inciting nature of the defendant's language and conduct. "[Even] [t]hough the fighting words standard is an objective inquiry . . . examining the subjective reaction of an addressee, although not dispositive, may be probative of the likelihood of a violent reaction." (Internal quotation marks omitted.) *State* v. *Parnoff*, supra, 329 Conn. 403. Although McCargo acknowledged that the defendant's racial epithets had shocked and appalled him and that he felt "very bad" and personally insulted by them, he quite rightly opined that he had "handled [him]self very well" under the circumstances. We fully agree, of course, that McCargo handled the incident exceptionally well, but we simply are not persuaded that the average person would have exercised a similar measure of self-control and professionalism under the same circumstances. Thus, the fact that McCargo did not react violently in the face of the defendant's malicious and demeaning insults does not alter our conclusion with respect to the likelihood of a violent reaction to that language. See, e.g., *State* v. *Hoshijo ex rel. White*, supra, 102 Haw. 322 ("[It] is of no consequence . . . [that violence was not precipitated], as the proper standard is whether the words were *likely to provoke a violent response*, not whether violence occurred. Plainly, there is no requirement that violence must occur, merely that there be a likelihood of violence. It is abundantly clear on the facts of this case that there was a likelihood of violence." (Emphasis in original.)); *Little Falls* v. *Witucki*, 295 N.W.2d 243, 246 (Minn. 1980) ("The fact that the addressee and object of the fighting words exercised responsible and mature forbearance in not retaliating cannot be relied [on] by [the] defendant to escape responsibility for his own actions. . . . The focus is properly on the nature of the words and the circumstances in which they were spoken rather than on the actual response. The actual response of the addressee and object of the words is relevant, but not determinative, of the issue of whether the utterances meet the fighting words test.").

We also reject the defendant's contention that his use of the epithets "fucking niggers" cannot provide the basis of his conviction in view of the fact that the defendant and McCargo were in their vehicles on both occasions when the defendant directed those slurs at McCargo. Because the rationale underlying the fighting words doctrine is the state's interest in preventing the

immediate violent reaction likely to result when highly offensive language is used to insult and humiliate the addressee, "[t]he potential to elicit [such] an immediate violent response exists only [when] the communication occurs [face to face] or in close physical proximity." *Billings* v. *Nelson*, 374 Mont. 444, 449, 322 P.2d 1039 (2014). This requirement is satisfied in the present case even though both men were in their vehicles when the defendant uttered the slurs. When the defendant did so for the first time, McCargo had pulled his vehicle so close to the defendant's vehicle that the defendant accused McCargo of intentionally blocking him in. On the second such occasion, the defendant turned directly toward McCargo as he drove by McCargo's vehicle and then repeated the slur loud enough so that McCargo would be sure to hear it. At this point, the men were sufficiently close that McCargo could see the angry expression on the defendant's face and discern that he had uttered the slur louder the second time than he had the first time. At all relevant times, therefore, the two men were in close proximity to and maintained eye contact with one another, so that each could see and hear the other clearly and without difficulty. In such circumstances, it would have been easy enough for McCargo to exit his vehicle and to charge after the defendant, or to ram the defendant's vehicle with his own, or to pursue the defendant out of the parking lot in his own vehicle. Unless the use of a vehicle by the speaker makes it impossible for the addressee to retaliate immediately, courts routinely have held that the likelihood of an immediate violent reaction is not diminished merely because the speaker or addressee was in a vehicle when the offending utterances were made. See, e.g., *In re John M.*, supra, 201 Ariz. 428–29 (passenger in car who yelled " 'fuck you, you god damn nigger' " before car pulled into parking lot was found to have used fighting words likely to provoke violent reaction); *Billings* v. *Nelson*, supra, 450 ("The fact that [the defendant and the driver] were in a car does not mean their speech could not have incited an immediate violent response from a listener on the street. . . . [The victim] was close enough to recognize the [speakers'] faces and to hear their words clearly, even though they did not holler them." (Citation omitted; internal quotation marks omitted.)); *In re S.J.N-K.*, 647 N.W.2d 707, 709, 711–12 (S.D. 2002) (when passenger in vehicle who repeatedly uttered " 'fuck you' " with accompanying middle finger gesture while driver of vehicle cut diagonally across adjacent parking lot and in front of addressee's vehicle, evidence established that passenger's words and gestures constituted unprotected fighting words). But cf. *Sandul* v. *Larion*, 119 F.3d 1250, 1252, 1255 (6th Cir.) (when passenger in vehicle traveling at high rate of speed shouted " '[fuck] you' " and extended his middle finger at abortion protesters who were located considerable distance away, there was no face-to-face contact between passenger and protesters, no

protester was offended or even acknowledged passenger's behavior, and entire incident was over in matter of seconds, "it was inconceivable that [the passenger's] fleeting actions and words would provoke the type of lawless action" necessary to satisfy fighting words standard), cert. dismissed, 522 U.S. 979, 118 S. Ct. 439, 139 L. Ed. 2d 377 (1997).

Finally, the defendant claims that the Appellate Court correctly concluded that the present case is governed by our analysis and conclusion in *State* v. *Baccala*, supra, 326 Conn. 232, in which we determined that the vulgar language at issue in that case did not constitute fighting words. We reject this argument because *Baccala* is distinguishable from the present case in a number of material respects.[13]

Before doing so, however, it is necessary to recite the relevant facts of *Baccala* and the reasons we reached the conclusion we did. Those facts, as explained in our decision in that case, are as follows. "On the evening of September 30, 2013, the defendant [Nina C. Baccala] telephoned the Stop & Shop supermarket in Vernon to announce that she was coming to pick up a Western Union money transfer so they would not close the customer service desk before she arrived. [Baccala] spoke with Tara Freeman, an experienced assistant store manager who was in charge of the daily operations at the supermarket . . . . Freeman informed [Baccala] that the customer service desk already had closed and that she was unable to access the computer that processed Western Union transactions. [Baccala] became belligerent, responded that she 'really didn't give a shit,' and called Freeman '[p]retty much every swear word you can think of' before the call was terminated.

"Despite Freeman's statements to the contrary, [Baccala] believed that as long as she arrived at the supermarket before 10 p.m., she should be able to obtain the money transfer before the customer service desk closed. Accordingly, a few minutes after she telephoned, [Baccala] arrived at the supermarket, which was occupied by customers and employees. [She] proceeded toward the customer service desk located in proximity to the registers for grocery checkout and began filling out a money transfer form, even though the lights at the desk were off. Freeman approached [Baccala], a forty year old woman who used a cane due to a medical condition that caused severe swelling in her lower extremities, and asked her if she was the person who had called a few minutes earlier. Although [Baccala] denied that she had called, Freeman recognized her voice. After Freeman informed [Baccala], as she had during the telephone call, that the customer service desk was closed, [Baccala] became angry and asked to speak with a manager. Freeman replied that she was the manager and pointed to her name tag and

a photograph on the wall to confirm her status. [Other] employees . . . were standing nearby as this exchange took place.

"[Baccala] proceeded to loudly call Freeman a 'fat ugly bitch' and a 'cunt,' and said 'fuck you, you're not a manager,' all while gesticulating with her cane. Despite [Baccala's] crude and angry expressions . . . Freeman remained professional. She simply responded, '[h]ave a good night,' which prompted [Baccala] to leave the supermarket." Id., 235–36. Following a jury trial, Baccala was convicted of breach of the peace in the second degree in violation of § 53a-181 (a) (5). Id., 233–34, 236. On appeal to this court, we agreed with Baccala that her conviction was incompatible with the first amendment. See id., 234–35.

We began our analysis of Baccala's claim with the observation that the language she used was both extremely offensive and intentionally demeaning. Id., 251. We nevertheless concluded that her utterances did not rise to the level of fighting words because, under the circumstances, they were not likely to trigger an immediate violent response by the average person in Freeman's position. Id., 254. In reaching this conclusion, we relied primarily on four considerations relative to the circumstances of the encounter. First, the verbal assault that Baccala launched against Freeman on the telephone placed Freeman on notice of the possibility that Baccala would resort to similar language when she arrived at the supermarket a few minutes later. Id., 252. Second, as a person in an "authoritative [position] of management and control," Freeman would be expected to diffuse such a hostile situation by "model[ing] appropriate, responsive behavior, aimed at de-escalating the situation," both for the sake of other customers and store personnel alike. Id., 253. Third, as a store manager, Freeman had a measure of control over the premises insofar as she could demand that Baccala leave if she became abusive, threaten to have Baccala arrested for trespassing if she didn't leave, and follow through on that threat if necessary. Id., 253. Fourth, there was no reason to think that Freeman's professional and restrained response to Baccala's offensive harangue was atypical of the manner in which an average person in Freeman's position would have responded to the same provocation under the same circumstances. See id., 253–54.

In the present case, the first three of the foregoing factors support the conclusion that the defendant's utterances *were*, in fact, fighting words. In contrast to the notice Freeman had received with respect to the likelihood of an angry and offensive, face-to-face outburst by Baccala, McCargo had no forewarning of the verbal abuse that the defendant inflicted on him. Unlike Freeman, McCargo was not acting in a supervisory capacity with respect to the safety and well-being of

others. Nor did he have any degree of control over the area in which his encounter with the defendant took place.

Only the fourth factor we considered in *Baccala*—the fact that Freeman did not resort to violence in responding to the verbal provocation she confronted—militates against a finding that the average person in the same situation as McCargo, who also refrained from any physical retaliation, likely would have had an immediate violent response to the defendant's verbal attack. In *Baccala*, however, our conclusion that the response of the average supermarket manager in Freeman's situation probably would be no different from Freeman's necessarily was predicated on the existence of the first three factors discussed—*none of which* is present here. Moreover, in *Baccala*, we expressly acknowledged that we might have reached a different conclusion if Baccala had directed the same language at Freeman after Freeman had completed work and left the supermarket. Id., 253. Notably, that situation—in which Freeman would not have been acting in a managerial or supervisory capacity, had no real control over the relevant premises, and was more or less alone with Baccala—is much more like the circumstances McCargo found himself in when he was accosted by the defendant.

Finally, we agree with the observation that "[r]acial insults, relying as they do on the unalterable fact of the victim's race and on the history of slavery and race discrimination in this country, have an even greater potential for harm than other insults." R. Delgado, "Words That Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling," 17 Harv. C.R.-C.L. L. Rev. 133, 143 (1982); see id., 135–36 (explaining that such insult "injures the dignity and self-regard of the person to whom it is addressed, communicating the message that distinctions of race are distinctions of merit, dignity, status, and personhood"); see also *Matusick* v. *Erie County Water Authority*, 757 F.3d 31, 38 n.3 (2d Cir. 2014) (observing that word "nigger" has "unique . . . power to offend, insult, and belittle"); *Toussaint* v. *Brigham & Women's Hospital, Inc.*, 166 F. Supp. 3d 110, 116 n.4 (D. Mass. 2015) ("[t]he word 'nigger' has unique meaning that makes its use particularly egregious"). In light of the uniquely injurious and provocative nature of the term, we also agree that its use is all the more likely to engender the kind of violent reaction that distinguishes fighting words from the vast majority of words that, though also offensive and provocative, are nevertheless constitutionally protected.

For all the foregoing reasons, we conclude that the language the defendant used to demean, intimidate and anger McCargo were fighting words likely to provoke a violent response from a reasonable person under the circumstances. Because the first amendment does not shield such speech from prosecution, the state was free

to use it to obtain the defendant's conviction of breach of the peace in the second degree, which, as we have explained, is supported by the evidence. Because the Appellate Court reached a contrary conclusion, that portion of its judgment reversing the defendant's conviction on that charge cannot stand.

The judgment of the Appellate Court is reversed with respect to the defendant's conviction of breach of the peace in the second degree only and the case is remanded to that court with direction to affirm the judgment of conviction on that charge; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker. Although Justice McDonald was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of oral argument prior to participating in this decision.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

** August 27, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (5) in a public place, uses abusive or obscene language or makes an obscene gesture . . . ."

[2] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

The first amendment prohibition against laws abridging the freedom of speech is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. E.g., *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996)

[3] The trial court also found the defendant guilty of tampering with a witness in violation of General Statutes § 53a-151. See footnote 4 of this opinion. On the charge of breach of the peace in the second degree, the court sentenced the defendant to a term of imprisonment of six months, execution suspended, followed by two years of probation with several conditions, plus a $1000 fine; on the charge of tampering with a witness, the court sentenced the defendant to a consecutive term of imprisonment of four years, execution suspended, followed by four years of probation with the same conditions and a $3000 fine. The defendant's conviction of tampering with a witness, which thereafter was upheld by the Appellate Court; see *State* v. *Liebenguth*, 181 Conn. App. 37, 58, 186 A.3d 39 (2018); is not the subject of this appeal. Unless otherwise noted, all references hereinafter to the defendant's conviction are to his conviction of breach of the peace in the second degree.

[4] The evidence adduced at trial also established that, on March 6, 2015, while his criminal case was pending, the defendant sent an e-mail to McCargo's supervisor at the New Canaan Parking Department indicating that he would press felony charges against McCargo and cause McCargo to lose his job if he appeared in court at the defendant's criminal trial and testified against him. See *State* v. *Liebenguth*, supra, 181 Conn. App. 42. The e-mail further stated that the defendant would not take such action against McCargo if he did not appear in court to testify against the defendant. Id. As the Appellate Court explained, "[t]he language of the defendant's e-mail clearly indicates that the defendant intended to induce McCargo not to appear in court, insofar as it stated: 'It goes without mention that if your meter maid [McCargo] does not show up in court this case will be over and everyone can go peacefully on their own way, no harm, no foul, no fallout' and '[p]erhaps the judge will remand him to custody right then and there from his witness chair? Obviously, not if he is not there.' " Id., 57–58. This evidence provided the basis for the trial court's guilty finding with respect

to the charge of tampering with a witness in violation of General Statutes § 53a-151. See footnote 3 of this opinion.

[5] We note that the Appellate Court read this statement by the trial court as reflecting a finding that the defendant took an aggressive stance, was walking toward McCargo, and moving his hands in an aggressive manner at the very same time he uttered the words "fucking niggers." (Internal quotation marks omitted.) *State* v. *Liebenguth*, supra, 181 Conn. App. 49. As the Appellate Court also observed; see id.; such a finding would be inconsistent with the trial testimony, which clearly established that the defendant was seated in his vehicle both times he directed that epithet at McCargo. In contrast to the Appellate Court, however, we do not understand the trial court to have found that the conduct referred to occurred simultaneously with the offensive utterances. Rather, we read the decision's reference to that conduct as consistent with the record; see, e.g., *Lauer* v. *Zoning Commission*, 220 Conn. 455, 470, 600 A.2d 310 (1991) (reviewing court reads arguably ambiguous trial court record to support, rather than to undermine, its judgment); that is, as reflecting a finding by the trial court only that the conduct was relevant to the broader context in which the defendant's epithets were uttered, which it certainly was. In any event, we, like the Appellate Court, resolve the issue on appeal predicated on the testimony adduced at trial, which is not disputed for purposes of this appeal.

[6] As we discuss more fully hereinafter, in *Baccala*, we concluded that the conviction of the defendant in that case—also for breach of the peace in the second degree in violation of § 53a-181 (a) (5)—had to be reversed, despite the vile and personally demeaning nature of the gender based epithets on which that conviction was predicated, in light of our determination that the defendant's speech was entitled to first amendment protection because it was not likely to evoke a violent response from a reasonable person under the circumstances presented. See *State* v. *Baccala*, supra, 326 Conn. 251–56.

[7] Specifically, we certified the following issue: "Did the Appellate Court properly conclude that the defendant's conviction for breach of the peace in the second degree had to be reversed in light of the holding in [*Baccala*] . . . ?" (Citation omitted.) *State* v. *Liebenguth*, supra, 330 Conn. 901.

[8] The defendant makes no claim that, in the event we disagree with the Appellate Court that his speech was protected by the first amendment to the United States constitution, his conviction nevertheless was barred by the free speech provisions of article first, §§ 4 and 5, of the Connecticut constitution. We therefore have no occasion to consider whether the fighting words exception to the protection afforded speech under the first amendment also constitutes an exception to the free speech guarantees of the state constitution and, if so, whether its scope is coextensive with that of the exception recognized under the first amendment.

[9] In this regard, we observed in *Baccala* that, "[i]n this day and age, the notion that any set of words are so provocative that they can reasonably be expected to lead an average listener to immediately respond with physical violence is highly problematic." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Baccala*, supra, 326 Conn. 239. Although the United States Supreme Court has not upheld a conviction under the fighting words doctrine since *Chaplinsky*; e.g., C. Calvert, "First Amendment Envelope Pushers: Revisiting the Incitement-to-Violence Test with Messrs. Brandenburg, Trump, & Spencer," 51 Conn. L. Rev. 117, 149 (2019); and, despite scholarly criticism of the doctrine; see, e.g., W. Reilly, Note, "Fighting the Fighting Words Standard: A Call for Its Destruction," 52 Rutgers L. Rev. 947, 947–49 (2000); Note, "The Demise of the *Chaplinsky* Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1140–46 (1993); the court has never disavowed the doctrine and, from time to time, has referred to it, albeit in dicta, as one of the few historic exceptions to the first amendment's prohibition against content based restrictions on speech. See, e.g., *Brown* v. *Entertainment Merchants Assn.*, 564 U.S. 786, 791, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011) ("From 1791 to the present . . . the [f]irst [a]mendment has permitted restrictions [on] the content of speech in a few limited areas, and has never include[d] a freedom to disregard these traditional limitations. . . . These limited areas . . . such as . . . fighting words . . . represent well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any [c]onstitutional problem . . . ." (Citations omitted; internal quotation marks omitted.)); *Virginia* v. *Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) ("[A] [s]tate may punish those words [that] by their very utterance inflict injury or tend to incite an immediate breach of the

peace. . . . [C]onsequently . . . fighting words—those personally abusive epithets [that], when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke a violent reaction—are generally proscribable under the [f]irst [a]mendment." (Citations omitted; internal quotation marks omitted.)). In any event, the defendant makes no claim that the fighting words doctrine is a dead letter for federal constitutional purposes; he claims, rather, that the words he used were not fighting words and, consequently, that his conviction based on those words is prohibited by the first amendment. In addition, as we previously noted; see footnote 8 of this opinion; the defendant does not raise a claim under the state constitution.

[10] New Dictionary of American Slang (R. Chapman ed., 1986) p. 151.

[11] The defendant relies on the following cases in which the court determined that certain words directed at a police officer were not fighting words: *Kennedy* v. *Villa Hills*, 635 F.3d 210, 215–16 (6th Cir. 2011) (calling police officer " 'son of a bitch' " and "a 'fat slob' "); *Johnson* v. *Campbell*, 332 F.3d 199, 203, 215 (3d Cir. 2003) (calling police officer who was conducting stop " 'son of a bitch' "); *Duran* v. *Douglas*, 904 F.2d 1372, 1377 (9th Cir. 1990) (shouting profanities and making obscene gestures at police officer); *Barboza* v. *D'Agata*, 151 F. Supp. 3d 363, 367, 371–72 (S.D.N.Y. 2015) ("[f]uck your shitty town bitches" written on payment form accompanying speeding ticket); *State* v. *Nelson*, 38 Conn. Supp. 349, 351 n.1, 355, 448 A.2d 214 (App. Sess. 1982) (calling police officer " 'fucking asshole, a fucking pig' ").

[12] We note, however, that there is nothing in the record to indicate that McCargo received any special training on how to deal with persons who become unusually irate or insulting upon being issued a parking ticket.

[13] We note that the defendant further contends that the trial court's requirement that he undergo a cultural diversity course prescribed and approved by his probation officer evidences that the trial court's guilty finding "constitutes a unique and unprecedented attempt to criminalize incivility or racist attitudes." We disagree. The probationary condition falls squarely within the court's considerable sentencing discretion, and, indeed, it is obviously well-founded in light of the defendant's conceded language and conduct.